# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES ex rel.** | : |
| | : |
| **CHRISTOPHER N. MCCUTCHEON**, | : |
| | : |
| *Relator-Plaintiff*, | : |
| | : |
| v. | : CIVIL ACTION NO. |
| | : 5:17-CV-0462-MHH |
| **QBR, LLC; VALLEY CENTER FOR** | : |
| **NERVE STUDIES AND** | : |
| **REHABILITATION, INC.; DERBY** | : |
| **MEDICAL BILLING SERVICES, INC.;** | : **ORAL ARGUMENT** |
| **ERIC R. BECK; JOHN** | : **REQUESTED** |
| **HORNBUCKLE; ORTHOPLUS, LLC;** | : |
| **BRIAN BOWMAN; AND MARK A.** | : |
| **MURPHY, M.D.** | : |
| *Defendants*. | : |
| | : |

## APPLICATION FOR DEFAULT JUDGMENT AGAINST
## <u>DEFENDANTS QBR, LLC AND JOHN HORNBUCKLE</u>

Under Federal Rule of Civil Procedure 55(b)(2), Relator Christopher N. McCutcheon applies to this Court for a default judgment in favor of the United States and McCutcheon and against Defendants QBR, LLC and John Hornbuckle. The following good cause supports this motion:

**A.     Procedural History.**

1.     Relator-Plaintiff McCutcheon filed a qui tam complaint under seal alleging violations of the False Claims Act on March 24, 2017. (Doc. 1).

2.  The complaint remained under seal for more than two years while the United States investigated the claims pleaded in the complaint. The United States did not intervene, so this Court unsealed the complaint on December 2, 2020. (Doc. 30).

3.  Both QBR and Hornbuckle were served with a summons and the complaint by process server on March 11, 2021. The returns of service are on file with this Court. (Docs. 36, 37).

4.  The responsive pleading deadline for QBR and Hornbuckle expired on April 1, 2021. Neither defendant appeared before this Court.

5.  On June 22, 2023, McCutcheon moved the clerk of court to enter a default against QBR and Hornbuckle. (Docs. 51, 52).

6.  The clerk entered a default against QBR and Hornbuckle; this Court ordered McCutcheon to apply for a default judgment against both defendants on or before July 24, 2023. (Docs. 54, 55).

7.  Because neither QBR nor Hornbuckle has appeared in this case, no further notice is required under Federal Rule of Civil Procedure 55(b)(2) for this Court to hold a hearing regarding this application for a default judgment or otherwise rule on this application.

**B.     The Complaint Contains Well-Pleaded Factual Allegations and Claims.**

8.     "To decide whether there is a sufficient basis for an entry of default judgment, the Court must review the complaint and its underlying merits." *Hermitage Ins. Co. v. KBC, LLC*, No. 3:10-CV-02305-MHH, 2014 WL 3892269, at *3 (N.D. Ala. Aug. 7, 2014).

9.     McCutcheon has pleaded claims against QBR and Hornbuckle for violations of 31 U.S.C. § 3729(a)(1). Under binding Eleventh Circuit precedent, as a result of their default, QBR and Hornbuckle are deemed to have admitted the well-pleaded allegations of the complaint. *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005); *Anheuser-Busch, Inc. v. Philpot*, 317 F. 3d 1264, 1266 (11th Cir. 2003).

10.     Further, "[w]hen an issue is resolved in favor of the United States in a criminal prosecution, that issue may not be contested by the same defendant in a subsequent civil suit brought by the government. This rule applies in all civil cases brought by the United States where a defendant previously has been found guilty, either by a jury verdict or by a guilty plea." *United States v. Killough*, 848 F.2d 1523, 1528 (11th Cir. 1988) (citation omitted).

11.     From September 2011 through December 2013, Relator was involved in the business operations of QBR. (Doc. 1, ¶¶ 3-4). Hornbuckle had recruited

Relator to join QBR, the business venture Hornbuckle hoped to start, as an investor and co-owner. (*Id*. ¶ 7).

12. "QBR arranged and schedules healthcare staffing, logistics management, telemedicine, and diagnostic equipment necessary to perform EMG, nerve conduction, ultrasound and other diagnostic tests on-site at the offices of various healthcare providers." (*Id*. ¶ 21).

13. Hornbuckle was "the President and Chief Executive Officer of Defendant QBR." (*Id*. ¶ 25). Hornbuckle held a "51% ownership interest in Defendant QBR. He [was] the primary salesperson and driving force for QBR." (*Id*. ¶ 25). Hornbuckle "negotiated the agreements between Defendant QBR and Defendant Valley Nerve. He instituted, planned, procured, and acted in furtherance of the schemes described here, contrary to the advice and urging of Relator." (*Id*. ¶ 25).

14. "QBR recklessly disregarded any and all compliance advice available to it because it did not explore, adopt, or create any relevant compliance policies to minimize the risk of waste, fraud, and abuse of the Federal healthcare programs." (Doc. 1, ¶ 54).

15. There were two fraudulent schemes by which QBR and Hornbuckle (the driving force behind QBR) violated Federal law. First, beginning in the first quarter of 2012, QBR worked in concert with Defendants Dr. Erick Beck and his

medical practice Valley Center for Nerve Studies and Rehabilitation, Inc. (Valley Nerve) to pay unlawful kickbacks based on referrals of electrodiagnostic testing. "QBR created its own time sheets, which established formulas that set predetermined time amounts spent to justify the per-hour fee. These pre-created time sheets were sent to the referring physicians regardless of the time actually spent, and without any actual determination of the time spent. These sheets were merely backfill data to support the per-test remuneration paid from QBR to the referring physician." (*Id*. ¶ 77).

16. Second, beginning in July 2012, QBR and Hornbuckle violated Federal law by working in concert with Defendants Bowman and OrthoPlus when "sales people for OrthoPlus" would "pitch the services of QBR, which in reality were the services provided by Valley Nerve, to doctors stating that the testing could be done on-site, the doctors could keep their patients in-house without referring them to other providers, and that the doctors could receive reimbursement for the electrodiagnostic tests, physical therapy services, and occupational therapy services that were provided" (*Id*. ¶ 99).

17. Stated succinctly, Hornbuckle and others caused false claims to be submitted for payment by the United States and its fiscal intermediaries:

> Defendants QBR, OrthoPlus, Hornbuckle, and Bowman by and through their agents, officers, and employees, knowingly caused to be made false records or statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(B) for electrodiagnostic tests, physical therapy

5

> services, and occupational therapy services arranged and referred through QBR to Valley Nerve and Beck from referring physicians. Defendant Defendants QBR, OrthoPlus, Hornbuckle, and Bowman caused the false CMS Form 1500 with the false certification of compliance with the Anti-Kickback Statute to be made by entering into a series of commission-based marketing agreements that violated the Anti-Kickback Statute as set forth above, and by arranging and referring the electrodiagnostic tests, physical therapy services, and occupational therapy services by Valley Nerve and Beck under those illegal commission-based marketing agreements.

(Doc. 1, ¶ 141; see also *id*. ¶¶ 142-44).

18.  Hornbuckle was criminally charged based on the same conduct that underlies this False Claims Act case. (Exh. 1 & 1-A - Declaration of Adam P. Plant & Hornbuckle Indictment at ¶¶ 22-52). Hornbuckle pleaded guilty to two counts of that indictment: count one, which alleged Hornbuckle violated Federal law when he conspired to pay and receive kickbacks under 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1); and count two, which alleged Hornbuckle violated Federal law when he participated in a healthcare fraud conspiracy in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1347. (*Id*).

19.  In his plea agreement, Hornbuckle agreed that he "offered and paid providers" money for referral of "medically unnecessary electro-diagnostic testing" and he "offered and paid kickbacks to sales representatives" for their work "to induce providers to refer medically unnecessary electro-diagnostic testing to QBR." (Exh. 1-B at 5).

6

20. "In FCA cases, when multiple parties cause the same indivisible harm to the government, courts have applied joint and several liability without a right to contribution." *United States v. Honeywell Int'l Inc.*, 47 F.4th 805, 810 (D.C. Cir. 2022).

21. To hold an executive "jointly and severally liable under the False Claims Act, the Government need only prove he participated in a conspiracy to submit false claims." *United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 284-85 (5th Cir. 2020); *see also Mortgs., Inc. v. U.S. Dist. Court for the Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 212 (9th Cir. 1991) (where "one or more persons have committed a fraud upon the government in violation of the [False Claims Act], each is jointly and severally liable"); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1013 (5th Cir. 1972) (imposing joint and several liability). As discussed above, based on the criminal conduct to which Hornbuckle has now pleaded guilty, that standard has been met here.

22. The complaint alleges "Defendants QBR, OrthoPlus, Hornbuckle, and Bowman conspired with Valley Nerve and Beck to knowingly present and cause to be presented false or fraudulent claims for payment" and to "make use or cause to be made or used a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C)." (Doc. 1, ¶ 142). They "entered into illegal

commission-based marketing contracts for the referral of electrodiagnostic tests, physical therapy services, and occupational therapy services." (Doc. 1, ¶ 143).

23. As such, the default judgments against Hornbuckle and QBR may be calculated and entered together because of the joint and several liability the False Claims Act imposes.

**C.   McCutcheon Requests this Court Award Damages that Reflect the Severity of the Violations at Issue to Compensate the United States.**

24. Based on the order of restitution from Hornbuckle's criminal case, Judge Coogler determined that Hornbuckle owed $5,344,919.85 in restitution to Federal payors based on his work at QBR. (Exh. 1-C at 1). Hornbuckle committed this unlawful conduct for the benefit of QBR, which received the benefit of this unlawful conduct.

25. The United States and the Relator, acting on its behalf, are entitled to three times the damages sustained as a result of each false claim affected by the violations of Federal law by QBR and Hornbuckle. 31 U.S.C. § 3729(a)(1) (A violator "is liable to the United States Government for a civil penalty" and "3 times the amount of damages which the Government sustains because of the act of that person."). Based on the restitution amount Judge Coogler ordered, the treble damages amount is a total of $16,034,759.55.

26. The existence of the underlying criminal conviction does not bar any of the civil relief sought by the Relator on behalf of the United States in this case.

8

*Hudson v. United States*, 522 U.S. 93, 99 (1997). "An order of restitution is not a judicial determination of damages." *United States v. Barnette,* 10 F.3d 1553, 1556 (11th Cir. 1994).

27. The Eleventh Circuit has a clear standard for imposing civil damages on convicted defendants who were ordered to pay restitution:

> The two remedies serve different purposes and are calculated in different ways. Restitution is "an equitable remedy" granted "only to the extent that justice between the parties requires." "Damages measure the amount of compensable loss a victim has suffered." Also, restitution is calculated based on factors such as a defendant's financial resources, financial needs, and earning abilities. In a damages action the sole question is whether the defendant wrongfully caused the loss.

*United States v. Anghaie*, 633 F. App'x 514, 518 (11th Cir. 2015) (citations omitted).

28. Relator believes Hornbuckle and QBR caused at least the restitution amount as single damages in this case, but with further discovery and evidence that number could be higher. Under the circumstances, however, Relator is willing to adopt the restitution amount as an easily-proven metric for single damages.

29. The United States and the Relator, acting on its behalf, also are entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 Note; Public Law 104-410) for each of the false claims caused to be submitted by QBR and Hornbuckle. Based on the evidence Relator has provided, there are at least 15,231 false claims submitted for payment because of the conduct

of QBR and Hornbuckle under the schemes described in the complaint. (Exh. 2 – Decl. of Christopher N. McCutcheon.) This means the civil penalty range for the false claims these defendants caused to be submitted is between $83,770,500 and $167,541,000.

30. This Court should assign a penalty amount based on the conduct of QBR and Hornbuckle. Assignment of the penalty amount requested below is proportionate and reasonable under the circumstances. It also complies with binding Eleventh Circuit law on this topic.

31. In *Yates v. Pinellas Hematology & Oncology*, P.A., 21 F.4th 1288 (11th Cir. 2021), the Eleventh Circuit considered whether penalties and treble damages were appropriate based on the conduct of a False Claims Act defendant. The court determined that, "[i]n this case, the imposition of the lowest-possible monetary award—though, as the district court noted, 'very harsh'—properly balances the need to deter potential fraudsters with the gravity of Pinellas' conduct. This is all the more so when one considers that the size of the award is a direct reflection of Pinellas' repeated and knowing submission of false claims to the United States." *Yates*, 21 F.4th at 1316.

32. In this case, QBR and Hornbuckle participated in a wide-ranging fraud scheme that cost the government significant amounts of money in false claims it paid. This case also caused harms to the government that included the costs to

investigate and prosecute criminal conduct. And, as with any fraudulent scheme in which the government is a victim, the public confidence in government programs and government efficacy are also harmed. The damages and penalties described here are appropriate when those factors are considered.

33. Further, McCutcheon is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1). Once this Court determines the substantive default judgment amount, McCutcheon will present a fee petition related to the prosecution of this case.

34. This Court should award fees and expenses associated with the litigation of the default judgment and any associated hearing, and even the time spent preparing a fee petition. *See, e.g., Gonter v. Hunt Valve Co.,* 510 F.3d 610, 620 (6th Cir. 2007); *United States ex rel. John Doe I v. Penn. Blue Shield*, 54 F. Supp. 2d 410, 414 (M.D. Pa. 1999) ("Under federal law regarding fee shifting statutes, time expended by attorneys seeking an award of fees (sometimes called "fees on fees") justifiably may be included in the application and the award."). The Eleventh Circuit has stated counsel are "entitled to reasonable compensation for litigating" attorney's fees issues. *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1309 (11th Cir. 2001).

35. This Court should grant the application for default judgment, which "is subject to review for abuse of discretion" only by the Eleventh Circuit. *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985).

McCutcheon requests that this Court award a default judgment against QBR and Hornbuckle in the amount of $16,034,759.55 for treble damages based on their conduct and impose the minimum penalty amount of $83,770,500 for the 15,231 false claims they caused to be submitted for payment under the schemes described in the complaint. This is a subtotal of $99,805,259.55. Relator also will file a petition for attorney's fees and costs once this Court awards its substantive relief.

**Dated: July 24, 2023**            Respectfully submitted,

*s/ Adam P. Plant*
Robert E. Battle
Adam P. Plant
**BATTLE & WINN LLP**
2901 Second Avenue South, Suite 220
Birmingham, AL 35233

***Attorneys for Relator Christopher N. McCutcheon***

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system on July 24, 2023, which will send notification of such filing to all counsel of record registered under the CM/ECF system to receive such notices.

And I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

    Special Mail — Open only in the presence of the inmate
    JOHN HORNBUCKLE
    Register Number: 96094-509
    FCI TALLADEGA
    FEDERAL CORRECTIONAL INSTITUTION
    SATELLITE CAMP
    P.M.B 2000
    TALLADEGA, AL  35160

    OrthoPlus, LLC
    c/o Eric McBrayer, Registered Agent
    120 Austin Circle
    Birmingham, Alabama 35242

                                        *s/ Adam P. Plant*
                                        OF COUNSEL