FILED
2023 Jul-24  PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# 1

## Declaration of Adam P. Plant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | : | |
| | : | |
| **CHRISTOPHER N. MCCUTCHEON,** | : | |
| | : | |
| *Relator-Plaintiff*, | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **5:17-CV-0462-MHH** |
| **QBR, LLC; VALLEY CENTER FOR** | : | |
| **NERVE STUDIES AND** | : | |
| **REHABILITATION, INC.; DERBY** | : | |
| **MEDICAL BILLING SERVICES, INC.;** | : | |
| **ERIC R. BECK; JOHN** | : | |
| **HORNBUCKLE; ORTHOPLUS, LLC;** | : | |
| **BRIAN BOWMAN; AND MARK A.** | : | |
| **MURPHY, M.D.** | : | |
| *Defendants*. | : | |
| | : | |

## <u>DECLARATION OF ADAM P. PLANT</u>

Adam P. Plant, under the penalty of perjury, declares as follows:

1.      I am one of the attorneys of record for Relator-Plaintiff Christopher N. McCutcheon. I have personal knowledge of the facts set forth here.

2.      Relator-Plaintiff McCutcheon filed a qui tam complaint under seal alleging violations of the False Claims Act on March 24, 2017. (Doc. 1).

3.      The complaint remained under seal for more than two years while the United States investigated the claims pleaded in the complaint.

4.      On December 2, 2020, this Court unsealed the complaint. (Doc. 30).

**Exhibit 1**

5.      Review of files of this District reveals that Defendant John Hornbuckle was prosecuted criminally for the same conduct that underlies this False Claims Act case. *U.S. v. Hornbuckle*, Case No. 5:22-cr-00078-LSC-NAD (N.D. Ala.).

6.      Attached as Exhibit A to this Declaration is Hornbuckle's indictment.

7.      Attached as Exhibit B to this Declaration is Hornbuckle's guilty plea.

8.      Hornbuckle pleaded guilty to two counts of that indictment: count one, which alleged Hornbuckle violated Federal law when he conspired to pay and receive kickbacks under 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1); and count two, which alleged Hornbuckle violated Federal law when he participated in a healthcare fraud conspiracy in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1347.

9.      In his plea agreement, Hornbuckle agreed that he "offered and paid providers" money for referral of "medically unnecessary electro-diagnostic testing" and he "offered and paid kickbacks to sales representatives" for their work "to induce providers to refer medically unnecessary electro-diagnostic testing to QBR." (Exh. B at 5).

10.     Hornbuckle was ordered to pay restitution by Judge Coogler. Attached as Exhibit C to this Declaration is the restitution order entered by Judge Coogler.

11.     Based on the order of restitution from Hornbuckle's criminal case, Judge Coogler determined that Hornbuckle owed $5,344,919.85 in restitution to Federal payors based on his work at QBR. (Exh. C at 1).

12.    We believe that the amount of damages we could prove as a result of the conspiracy claims pleaded in the complaint would be at least that high.

13.    Based on the evidence my client has provided to me, I believe that there were at least 15,231 false claims submitted for payment under the schemes described in the complaint from December 2011 through March 2017.

14.    These false claims were directly caused by the conspiracy in which QBR and John Hornbuckle were active participants.

15.    Attached as Exhibit D to this Declaration is the judgment in Hornbuckle's criminal case.

16.    Attached as Exhibit E to this Declaration is the amended order of forfeiture in Hornbuckle's criminal case.

17.    Attached as Exhibit F to this Declaration is the sentencing memorandum filed by the United States in Hornbuckle's criminal case.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed on: July 24, 2023**    Respectfully submitted,

Adam P. Plant

3
**Exhibit 1**

# EXHIBIT

# A

## Hornbuckle's Indictment

FILED

2022 Mar-30  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

PFE/JBW/DBL: April 2022
GJ#29

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JOHN HORNBUCKLE** | ) |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### THE DEFENDANT AND RELATED INDIVIDUALS AND ENTITIES

1.     **JOHN HORNBUCKLE** resided in Huntsville, Alabama.  He served as President and CEO of QBR, LLC (QBR), which was a company that provided electro-diagnostic testing.

2.     Doctor 1 resided in Huntsville, Alabama.  Doctor 1 owned and operated Valley Center for Nerve Studies and Rehabilitation ("Valley Center") and billed insurers for electro-diagnostic testing performed by QBR technicians.

3.     Doctor 2 worked for Valley Center and interpreted the results of electro-diagnostic testing performed by QBR technicians.

4.     Dr. Mark Murphy operated pain clinics in Tennessee and Alabama.

**Exhibit A**

**HORNBUCKLE** paid Dr. Murphy, through QBR, to refer patients to QBR for electro-diagnostic testing.

5.     Doctor 3 was a physician at a pain clinic in Rainbow City, Alabama. **HORNBUCKLE** paid Doctor 3's pain clinic, through QBR, to refer patients to QBR for electro-diagnostic testing.

### QBR AND NERVE TESTING

6.     QBR was an Alabama limited liability company with its principal place of business in Huntsville, Alabama.  It did business under the name Diagnostic Referral Community.  QBR was in the business of, among other things, conducting electro-diagnostic testing, including nerve conduction velocity tests (NCV tests) and sensory evoked potential tests (SEP tests).

7.     An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve damage.  An NCV test is performed by running an electrical impulse through the nerve being tested.

8.     An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

9.     QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by physicians, and QBR provided the testing equipment for those tests.  QBR technicians went to the referring physician office to perform testing on

2

patients there. In exchange for referring patients to QBR, QBR paid the referring physician or the referring physician's practice a fee for each patient referred.

10. QBR sent the NCV and SEP test results to Valley Center, which was operated by Doctor 1. The test results were generally interpreted by Doctor 2. After tests were interpreted, a separate billing company, owned by Doctor 1, used Doctor 1's National Provider Identifier (NPI) number to bill each patient's insurance for the testing. An NPI number is a unique ten-digit number used by healthcare providers to identify themselves. Later, the billing company used Doctor 2's NPI number to bill the patient's insurance for the testing. Regardless of whether Doctor 1's or Doctor 2's NPI number was used, Valley Center was then paid by the patient's insurance for the testing.

11. Doctor 1 and **HORNBUCKLE** had an agreement whereby Valley Center then paid money it received from insurance to QBR. During a certain period, QBR then paid a portion of the money back to Valley Center.

<u>BILLING FOR MEDICAL SERVICES</u>

12. Various public and private entities offer health insurance plans to cover medical care, pharmaceuticals, diagnostic tests, and other services provided to individuals covered by those plans, who are often referred to as "beneficiaries" or "members."

13. Blue Cross Blue Shield of Alabama (BCBSAL) is a private health

3

**Exhibit A**

insurance company that provides medical insurance in Alabama and elsewhere.

14.    The Medicare program is a federal healthcare benefit program providing benefits to persons over the age of 65 or disabled.   Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

15.    TRICARE is a health care benefit program of the United States Department of Defense (DOD) Military Health System that provides certain medical insurance coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors.

16.    The Alabama Medicaid program provides medical insurance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid program is jointly financed by the federal and state governments.

17.    BCBSAL, Medicare, TRICARE, and Medicaid make insurance payments directly to a provider of medical services or goods, rather than to a beneficiary.  This payment occurs after the provider submits the claim to the healthcare benefit program for payment, either directly or through a billing company.  By enrolling in BCBSAL, Medicare, TRICARE, or Medicaid, and then submitting a claim for payment, a healthcare provider is certifying that services or

4

**Exhibit A**

goods being provided to a patient are provided in accordance with the requirements of the insurer.

18.     BCBSAL, Medicare, TRICARE, and Medicaid will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods.

19.     In addition, BCBSAL, Medicare, TRICARE, and Medicaid will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute.

20.     BCBSAL, Medicare, TRICARE, and Medicaid require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

21.     Medicare, TRICARE, and Medicaid are "federal health care programs," as defined in Title 42, United States Code, Section 1320a-7b(f). BCBSAL, Medicare, TRICARE, and Medicaid are all "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

**<u>COUNT ONE</u>**
Conspiracy to Pay and Receive Kickbacks
[18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1))]

22.     The allegations in Paragraphs 1 through 21 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

5

23.     From at least in or about December 2012 and continuing through in or about January 2018 within Madison County in the Northern District of Alabama and elsewhere, defendant

## JOHN HORNBUCKLE

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs and the United States Department of Defense in its administration and oversight of TRICARE, in violation of Title 18, United States Code, Section 371;

b.      to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to: (A) any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which

6

payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and TRICARE; and (B) purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care program, that is, Medicare, Medicaid, and TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(2); and

c.    to knowingly and willfully solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and TRICARE; and (B) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing and ordering any good, facility, service and item for which payment may be made in whole and in part under Federal health care programs, that is, Medicare, Medicaid, and

**Exhibit A**

TRICARE, in violation of Title 42, United States Code, Section 1320a-7b(b)(1).

### **Purpose of the Conspiracy**

24.     It was the purpose of the conspiracy for defendant **HORNBUCKLE** and his co-conspirators to unlawfully enrich and benefit themselves by:  (1) offering, paying, soliciting, and receiving kickbacks and bribes to ensure that orders for electro-diagnostic testing, including NCV and SEP testing, for Medicare, Medicaid, and TRICARE beneficiaries would be referred to and performed by QBR; (2) submitting and causing to be submitted claims to Medicare, Medicaid, and TRICARE for these items and services based on these referrals; (3) concealing and disguising the payment, receipt, and transfer of illegal kickbacks and the proceeds of the fraud; and (4) using proceeds of the scheme for their personal use and benefit and the use and benefit of others.

### **Manner and Means**

25.     The manner and means by which defendant **HORNBUCKLE** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

26.     **HORNBUCKLE** offered and paid providers, including Dr. Murphy and Doctor 3's pain clinic, in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary

**Exhibit A**

electro-diagnostic testing.

27.    For example, **HORNBUCKLE** caused QBR to pay providers a flat fee for each patient that provider referred to QBR for testing once that testing was reimbursed by insurers, including by Federal health care programs.  These payments were disguised as hourly payments for the provider's time and the time of the provider's staff, but the provider was actually compensated on a per-patient basis.

28.    Dr. Mark Murphy and other providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

29.    **HORNBUCKLE** caused QBR to pay Dr. Murphy over $1 million in kickbacks.  As a result, QBR caused Federal health care programs to be billed over $8.3 million for electro-diagnostic testing performed on patients referred by Dr. Murphy.

30.    **HORNBUCKLE** caused QBR to pay Doctor 3's pain clinic over $100,000 in kickbacks.  As a result, QBR caused Federal health care programs to be billed over $2.1 million for electro-diagnostic testing performed on patients referred by Doctor 3.

31.    **HORNBUCKLE** also paid independent sales representatives a flat fee for each patient that a provider associated with that sales representative referred to QBR for testing once that testing was reimbursed by insurers, including by Federal

**Exhibit A**

health care programs.

## Overt Acts

32.    In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Alabama and elsewhere, at least one of the following overt acts, among others:

33.    On or about December 21, 2012, **HORNBUCKLE** caused QBR to pay an $18,000 kickback to Dr. Murphy.

34.    On or about July 11, 2016, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

35.    On or about July 18, 2016, **HORNBUCKLE** caused QBR to pay a $7,000 kickback to Dr. Murphy.

36.    On or about November 16, 2016, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Doctor 3.

37.    On or about November 21, 2016, **HORNBUCKLE** caused QBR to pay a $10,850 kickback to Doctor 3's pain clinic.

38.    On November 29, 2016, **HORNBUCKLE** caused QBR to pay a $32,815 kickback to a company owned by a sales representative for electro-diagnostic testing performed by QBR on a patient referred by providers associated with that sales representative.

10

**Exhibit A**

39.     On or about July 13, 2017, Medicare was billed over $2,000 for electro-diagnostic testing performed by QBR on a patient referred by Dr. Murphy.

40.     On or about July 19, 2017, **HORNBUCKLE** caused QBR to pay a $7,000 kickback to Dr. Murphy.

41.     On or about December 27, 2017, Medicare was billed over $1,500 for electro-diagnostic testing performed by QBR on a patient referred by Doctor 3.

42.     On or about January 8, 2018, **HORNBUCKLE** caused QBR to pay a $7,100 kickback to Doctor 3's pain clinic.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Healthcare Fraud Conspiracy
[18 U.S.C. § 1349 (18 U.S.C. § 1347)]

43.     Paragraphs 1 through 42 of this Indictment are realleged and incorporated as though fully set forth herein.

44.     From at least in or about December 2012 and continuing through in or about January 2018 within Madison County in the Northern District of Alabama and elsewhere, defendant

## JOHN HORNBUCKLE

did knowingly and willfully conspire, combine, confederate and agree with others known and unknown to the Grand Jury to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United

11

**Exhibit A**

States Code, Section 24(b), that is, Medicare, Medicaid, TRICARE, BCBSAL, and others, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

45.    It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, BCBSAL, and others for claims for items and services that were: (i) medically unnecessary, (ii) not eligible for reimbursement, (iii) not provided as represented, and (iv) based on kickbacks and bribes; (b) concealing the submission of false and fraudulent claims to Medicare, Medicaid, TRICARE, BCBSAL, and others and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

## Manner and Means

46.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among

12

**Exhibit A**

others, the following:

47.     **HORNBUCKLE** offered and paid providers in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

48.     **HORNBUCKLE** offered and paid kickbacks to sales representatives in the form of direct and indirect remuneration in exchange for and for the purpose of causing those sales representatives to induce providers to refer medically unnecessary electro-diagnostic testing to QBR.

49.     Doctor 1 billed health care benefit programs, including Medicare, Medicaid, TRICARE, BCBSAL, and others, for medically unnecessary electro-diagnostic testing.

50.     **HORNBUCKLE** and Doctor 1 failed to collect mandatory patient co-pays due for electro-diagnostic testing to incentivize patients not to decline the medically unnecessary procedures.

51.     Doctor 1 improperly hid from insurers who was performing and interpreting the results of the electro-diagnostic testing.

52.     In total, health care benefit programs, including Medicare, Medicaid, TRICARE, BCBSAL, and others, were billed over $20 million for medically unnecessary electro-diagnostic testing performed by QBR on patients referred by providers who had been paid kickbacks by QBR.

**Exhibit A**

All in violation of Title 18, United States Code, Section 1349.

## COUNT 3
Money Laundering Conspiracy
[18 U.S.C. § 1956(h) (18 U.S.C. § 1957)]

53.     Paragraphs 1 through 52 of this Indictment are realleged and incorporated as though fully set forth herein.

54.     From at least in or about April 2014 and continuing through in or about June 2017 within Madison County in the Northern District of Alabama and elsewhere, defendant

### JOHN HORNBUCKLE

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit an offense under Title 18, United States Code Section 1957, to wit: to knowingly engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property being derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.  It is further alleged that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

14

**Exhibit A**

## Manner and Means

55.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

56.    **HORNBUCKLE** conspired with Doctor 1 to cause monetary transactions of criminally derived property of a value greater than $10,000 by transferring money by check from an account controlled by QBR to an account controlled by Valley Center.

All in violation of Title 18, United States Code, Section 1956(h).

## FIRST NOTICE OF FORFEITURE
### 18 U.S.C. § 982(a)(7)

1.    The allegations in COUNT 1 through COUNT 3 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.    Upon conviction of the offenses set forth in COUNT 1 through COUNT 3 of this Indictment, defendant **JOHN HORNBUCKLE** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3.    The property to be forfeited includes, but is not limited to, forfeiture money judgments in United States currency, representing the amount of proceeds

15

obtained, controlled, and benefited from as a result of the offenses alleged.

4.      If any of the property described above, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

**Exhibit A**

All pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

A TRUE BILL

*/s/Electronic Signature*

_____

FOREPERSON OF THE GRAND JURY

PRIM F. ESCALONA
United States Attorney

*/s/Electronic Signature*

_____

JOHN B. WARD
Assistant United States Attorney

*/s/Electronic Signature*

_____

DON B. LONG III
Assistant United States Attorney

17

**Exhibit A**

# EXHIBIT

# B

## Hornbuckle's Plea Agreement

FILED

2022 Nov-03  PM 01:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case 5:22-cr-00078-LSC-NAD** |
| | ) | |
| **JOHN HORNBUCKLE** | ) | |

## PLEA AGREEMENT

The Government and the defendant, **JOHN HORNBUCKLE,** hereby acknowledge the following plea agreement in this case:

## PLEA

The defendant agrees to (i) plead guilty to Counts 1 and 2 of the Indictment filed in the above-numbered and -captioned matter; (ii) pay a $250,000 fine; (iii) consent to forfeiture as described in section **XII** below; (iv) pay restitution in an amount to be determined by the Court at sentencing; and (v) waive certain rights to direct appeal and collateral attack as outlined in section **IV** of this agreement.  In exchange, the United States Attorney, acting on behalf of the Government and through the undersigned Assistant United States Attorneys, agrees to dismiss Count 3 at the time of sentencing and recommend the disposition specified below, subject to the conditions in section **VII.**

Defendant's Initials _JH_

**Exhibit B**

## <u>TERMS OF THE AGREEMENT</u>

### I.      MAXIMUM PUNISHMENT

The defendant understands that the maximum statutory punishment that may be imposed for the crime of conspiracy to pay and receive kickbacks, in violation of Title 18, United States Code, Section 371, as charged in Count 1, is:

A.      Imprisonment for not more than five years,

B.      A fine of not more than $250,000, or

C.      Both A and B;

D.      Supervised release of not more than three years; and

E.      A special assessment of $100.

The defendant understands that the maximum statutory punishment that may be imposed for the crime of conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349 and 1347, as charged in Count 2, is:

A.      Imprisonment for not more than ten years,

B.      A fine of not more than $250,000, or

C.      Both A and B;

D.      Supervised release of not more than three years; and

E.      A special assessment of $100.

Defendant's Initials _____

**Exhibit B**

## II.   FACTUAL BASIS FOR PLEA

The Government is prepared to prove, at a minimum, the following facts at the trial of this case:

During the period between at least in or about 2012 and in or about 2018, the defendant conspired with others to pay and receive kickbacks in violation of the Anti-Kickback Statute, in violation of Title 18, United States Code, Section 371. During the same period, the defendant conspired with others to commit health care fraud, in violation of Title 18, United States Code, Sections 1349 and 1347.

### A.   Relevant Individuals and Entities

The defendant resided in Huntsville, Alabama.  He served as president and CEO of QBR, LLC (QBR), a company that provided electro-diagnostic testing.  The defendant paid sales representatives to generate patient referrals to QBR for electro-diagnostic testing.  The defendant paid medical providers to refer patients to QBR for electro-diagnostic testing.

Dr. Mark Murphy operated pain clinics in Tennessee and Alabama.  The defendant paid Dr. Murphy, through QBR, to refer patients to QBR for electro-diagnostic testing.

The individual identified as Doctor 3 in the Indictment was a physician at a pain clinic in Rainbow City, Alabama.  The defendant paid Doctor 3's pain clinic, through QBR, to refer patients to QBR for electro-diagnostic testing.

Dr. Eric Beck resided in Huntsville, Alabama.  Dr. Beck owned and operated Valley Center for Nerve Studies and Rehabilitation (Valley Center) and billed insurers for electro-diagnostic testing performed by QBR technicians.

QBR was an Alabama limited liability company with its principal place of business in Huntsville, Alabama.  It did business under the name Diagnostic Referral Community.

Medicare is a "federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).  Medicare is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).  This and other health care

Exhibit B

benefit programs will pay a medical provider only for medical services or goods that are medically necessary for the treatment of the patient being provided the services or goods. In addition, these health care benefit programs will not pay for medical services or goods that were provided in violation of the federal Anti-Kickback Statute. These health care benefit programs also require providers to collect co-pays, typically a fixed amount, from patients, in part so that the patient is financially motivated to decline medically unnecessary or otherwise fraudulent services or goods.

### B.    QBR

QBR was in the business of, among other things, conducting electro-diagnostic testing, including nerve conduction velocity tests ("NCV tests") and sensory evoked potential tests ("SEP tests").

An NCV test, also called a nerve conduction study, measures how fast an electrical impulse moves through a patient's nerve and is used to identify nerve damage. An NCV test is performed by running an electrical impulse through the nerve being tested.

An SEP test measures electrical activity in the brain in response to stimulation of sight, sound, or touch.

QBR employed technicians to perform NCV and SEP tests on patients referred to QBR by physicians, and QBR provided the testing equipment for those tests. QBR technicians went to the referring physician office to perform testing on patients there. In exchange for referring patients to QBR, QBR paid the referring physician or the referring physician's practice a fee for each patient referred.

QBR sent the NCV and SEP test results to Valley Center, which was operated by Dr. Beck. After tests were interpreted, a separate billing company, owned by Dr. Beck, billed each patient's insurance for the testing. Valley Center was then paid by the patient's insurance for the testing. Valley Center then paid money it received from insurance to QBR.

The defendant paid marketers to market QBR's NCV and SEP testing to referring physicians. A marketer received a fee for each patient referred for testing by providers the marketer was associated with once the test was reimbursed by insurance.

Defendant's Initials

**Exhibit B**

Federal health care programs were ultimately billed millions of dollars for medically unnecessary electro-diagnostic testing ordered by medical providers who received kickbacks from the defendant.

## C.     Conspiracy Conduct

The conspiracies charged in Counts 1 and 2 of the Indictment centered on the marketing of NCV and SEP tests that were not medically necessary and that were generated by way of kickbacks to sales representatives and ordering doctors.  The defendant knew that insurers would not pay for items or services that had been referred or ordered on the basis of kickbacks, or that were not medically necessary and prescribed by a medical provider for a particular patient's particular medical needs.  The conspiracy conduct included the following:

Medical providers solicited and received kickbacks in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.

The defendant offered and paid providers, including Doctor 3's pain clinic, in the form of direct and indirect remuneration in exchange for and for the purpose of inducing referrals for medically unnecessary electro-diagnostic testing.  For example, the defendant caused QBR to pay providers a flat fee for each patient that provider referred to QBR for testing that was reimbursed by insurers, including by Federal health care programs.  These payments were disguised as hourly payments for the provider's time and the time of the provider's staff, but the provider was actually compensated on a per-patient basis.  The defendant caused QBR to pay Doctor 3's pain clinic more than $100,000 in kickbacks.

The defendant also offered and paid kickbacks to sales representatives in the form of direct and indirect remuneration in exchange for and for the purpose of causing those sales representatives to induce providers to refer medically unnecessary electro-diagnostic testing to QBR.

The defendant knew that health care benefit programs, including Medicare and Blue Cross Blue Shield of Alabama, were billed for medically unnecessary electro-diagnostic testing ordered by providers, including Doctor 3, who were paid kickbacks for their orders.

Page 5 of 19          Defendant's Initials _____

**Exhibit B**

Among the overt acts committed in furtherance of the kickback conspiracy. on or about July 19, 2017, the defendant caused QBR to pay a $7,000 kickback to Dr. Mark Murphy.  And on or about January 8, 2018, the defendant caused QBR to pay a $7,100 kickback to Doctor 3's pain clinic.

### D.     Venue

The acts described above occurred within Madison County in the Northern District of Alabama, and elsewhere.  Venue is appropriate in the Northern District of Alabama.

### E.     Loss Amount

The parties stipulate that, for purposes of calculating the defendant's sentencing guidelines, the amount of loss attributable to the defendant for the kickback and health care fraud conspiracies, based on his knowledge, is $9,192,000. The parties further stipulate that the loss to Government health care programs is $5,344,917.

**The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence.  The defendant further acknowledges that these facts do not constitute all of the evidence of each and every act that the defendant and/or any co-conspirators may have committed.**

JOHN HORNBUCKLE

## III.     RECOMMENDED SENTENCE

Subject to the limitations in section **VII** regarding subsequent conduct and

pursuant to Fed. R. Crim. P. 11(c)(1)(B), the Government will recommend the

following disposition:

A.     That the defendant be awarded a two-level reduction in the defendant's adjusted offense level, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for

**Exhibit B**

the defendant's criminal conduct. The Government agrees to make a motion pursuant to USSG §3E1.1(b) for an additional one-level decrease in recognition of the defendant's prompt notification to the Government of the intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility if the defendant: (1) fails to admit each and every item in the factual stipulation; (2) denies involvement in the offense; (3) gives conflicting statements about the defendant's involvement in the offense; (4) is untruthful with the Court, the Government, or the United States Probation Officer; (5) obstructs or attempts to obstruct justice prior to sentencing; (6) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (7) attempts to withdraw the defendant's plea of guilty for any reason other than those expressly enumerated in the "Waiver of Right to Appeal and Post-Conviction Relief" section of this Plea Agreement;

B.   That the defendant be remanded to the custody of the Bureau of Prisons and incarcerated for a term consistent with the advisory United States Sentencing Guideline range as calculated by the Court at the time of sentencing;

C.   That following the said term of imprisonment, the defendant be placed on supervised release for a period to be determined by the Court, subject to the Court's standard conditions of supervised release and the following special condition(s): that the defendant not work in a job that involves billing Federal health insurance programs or work for a business that bills Federal health care programs;

D.   That the defendant be required to pay restitution to all the victims of the defendant's crimes, as determined by the Court;

E.   That the defendant pay a fine of $250,000 in accordance with the Sentencing Guidelines, said amount due and owing as of the date sentence is pronounced, with any outstanding balance to be paid in full by the expiration of the term of supervised release;

F.   That the defendant be required to comply with the forfeiture provisions set forth in section **XII** of this agreement; and

**Exhibit B**

G. That the defendant pay a special assessment of $100, said amount due and owing as of the date sentence is pronounced.

## IV. WAIVERS

### A. STATUTE OF LIMITATIONS WAIVER

In consideration of the recommended disposition of this case, I, JOHN HORNBUCKLE, hereby understand, acknowledge, and agree that if this plea agreement is set aside for any reason, I will not assert any defense based on any applicable statute of limitations or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, that includes the passage of time from and including the date of this plea agreement until and including the date of entry of any order setting this plea agreement aside.

### B. RIGHT TO APPEAL AND POST-CONVICTION RELIEF

In consideration of the recommended disposition of this case, I, JOHN HORNBUCKLE, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose.  Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C.

§ 2255, and any argument that (1) the statute(s) to which I am pleading guilty is or are unconstitutional or (2) the admitted conduct does not fall within the scope of the statute(s).

The defendant reserves the right to contest in an appeal or post-conviction proceeding(s) the following:

1. Any sentence imposed in excess of the applicable statutory maximum sentence(s);

2. Any sentence imposed in excess of the Guidelines range determined by the Court at the time sentence is imposed; and

3. Ineffective assistance of counsel.

The defendant acknowledges that before giving up these rights, the defendant discussed the United States Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.

I, JOHN HORNBUCKLE, hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.

_____
JOHN HORNBUCKLE

Defendant's Initials _____

**Exhibit B**

## V. UNITED STATES SENTENCING GUIDELINES

The defendant's counsel has explained to the defendant, that in light of the United States Supreme Court's decision in *United States v. Booker*, the federal sentencing guidelines are **advisory** in nature. Sentencing is in the Court's discretion and is not required to be within the guideline range. The defendant agrees that, pursuant to this agreement, the Court may use facts it finds by a preponderance of the evidence to reach an advisory guideline range, and the defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt.

## VI. AGREEMENT NOT BINDING ON COURT

The defendant fully and completely understands and agrees that it is the Court's duty to impose sentence upon the defendant and that any sentence recommended by the Government is **NOT BINDING UPON THE COURT,** and that the Court is not required to accept the Government's recommendation. Further, the defendant understands that if the Court does not accept the Government's recommendation, the defendant does not have the right to withdraw the guilty plea.

## VII. VOIDING OF AGREEMENT

The defendant understands that if the defendant (a) violates any federal, state, or local law or any condition of pretrial release after entering into this plea agreement, (b) moves the Court to accept a plea of guilty in accordance with, or pursuant to, the provisions of *North Carolina v. Alford*, 400 U.S. 25 (1970),

Defendant's Initials

**Exhibit B**

(c) tenders a plea of *nolo contendere* to the charges, (d) violates any other term of this plea agreement, and/or (e) does or says anything that is inconsistent with the acceptance of responsibility, the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein.  Further, such election will not entitle the defendant to withdraw a previously entered plea.

## VIII.    OTHER DISTRICTS AND JURISDICTIONS

The defendant understands and agrees that this agreement **DOES NOT BIND** any other United States Attorney in any other district, or any other state or local authority.

## IX.    COLLECTION OF FINANCIAL OBLIGATION

In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to:

- fully disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party;

- promptly submit a completed financial statement to the United States Attorney's Office, in a form that it provides and as it directs;

- identify all assets over which the defendant exercises or exercised control,

Page 11 of 19          Defendant's Initials <u>AA</u>

**Exhibit B**

directly or indirectly, within the past five years, or in which the defendant has or had during that time any financial interest;

- take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant;

- undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

The defendant further agrees that the above information, as well as any of the defendant's financial statements and disclosures, will be complete, accurate, and truthful. Finally, the defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## X.  AGREEMENT REGARDING RELEVANT CONDUCT AND RESTITUTION

As part of the defendant's plea agreement, the defendant admits to the above facts associated with the charges and relevant conduct for any other acts. The defendant understands and agrees that the relevant conduct contained in the factual basis will be used by the Court to determine the defendant's range of punishment under the advisory sentencing guidelines. The defendant admits that all of the crimes listed in the factual basis are part of the same acts, scheme, and course of conduct.

Defendant's Initials

**Exhibit B**

This agreement is not meant, however, to prohibit the United States Probation Office or the Court from considering any other acts and factors, which may constitute or relate to relevant conduct. Additionally, if this agreement contains any provisions providing for the dismissal of any counts, the defendant agrees to pay any appropriate restitution to each of the separate and proximate victims related to those counts should there be any and waives objection to the inclusion of that restitution in any order issued by the Court.

## XI.  TAX, FORFEITURE AND OTHER CIVIL/ADMINISTRATIVE PROCEEDINGS

Unless otherwise specified herein, the defendant understands and acknowledges that this agreement does not apply to or in any way limit any pending or prospective proceedings related to the defendant's **tax liabilities**, if any, or to any pending or prospective **forfeiture** or other **civil** or **administrative** proceedings.

## XII.  FORFEITURE

**The defendant agrees to consent to the immediate entry of a final order of forfeiture against the defendant, pursuant to Fed. R. Crim. P. 32.2(b)(l), in the amount of $176,449.19, which represents proceeds the defendant personally obtained, controlled, and benefitted from as a result of the offenses alleged in Counts 1 and 2 of the Indictment and to which the defendant is indicating the defendant's desire to plead guilty by way of this written Plea Agreement. For**

Defendant's Initials

**Exhibit B**

purposes of entering said order of forfeiture, the defendant acknowledges that a nexus exists between said amount and the criminal offenses to which the defendant is pleading guilty.

The defendant acknowledges that if, due to an act or omission of the defendant, directly forfeitable property: (i) cannot be located upon the exercise of due diligence; (ii) has been transferred or sold to, or deposited with, a third party; (iii) has been placed beyond the jurisdiction of the Court; (iv) has been substantially diminished in value; or (v) has been commingled with other property which cannot be divided without difficulty, as a result, the Government is authorized under law to seek the forfeiture of any and all assets of the defendant as substitute assets for the purpose of satisfying the final order of forfeiture until same is satisfied in full. As a result, the defendant consents to the forfeiture of any and all of the defendant's property up to the value of $176,449.19, representing proceeds the defendant personally obtained, controlled, and benefitted from as a result of the offenses alleged in Counts 1 and 2 of the Indictment.

The defendant agrees to take all steps as requested by the Government to pass clear title to forfeitable assets to the Government, and to testify truthfully in any judicial forfeiture proceeding. The defendant hereby waives the requirements of Fed. R. Crim. P. 32.2 regarding notice of the forfeiture in the Indictment,

Defendant's Initials

**Exhibit B**

announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant also waives the requirements of Fed. R. Crim. P. 43(a) with respect to the imposition of any forfeiture sanction carried out in accordance with this plea agreement. The defendant acknowledges that the defendant understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise the defendant of this, pursuant to Fed. R. Crim. P. 11(b)(1)(J), at the time the defendant's guilty plea is accepted.

The defendant further waives all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including any Double Jeopardy challenges that the defendant may have to the entry of a Forfeiture Order before sentencing, and any claims, defenses or challenges arising under the Excessive Fines Clause of the Eighth Amendment resulting from the forfeiture imposed as a result of this Indictment and/or any pending or completed administrative or civil forfeiture actions based upon the course of conduct that provides the factual basis for the forfeiture.

## Non-Abatement of Criminal Forfeiture

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any

**Exhibit B**

underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon the defendant's heirs, successors, and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full. To the extent that forfeiture pursuant to this agreement requires the defendant to disgorge wrongfully obtained criminal proceeds for the benefit of the defendant's victims, the defendant agrees that the forfeiture is primarily remedial in nature.

## XIII.     IMMIGRATION STATUS

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which the defendant is pleading guilty. The defendant's guilty plea and conviction make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States if the defendant is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however; and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Understanding all of this, the defendant nevertheless affirms that the defendant wants to plead guilty regardless of any

**Exhibit B**

immigration consequences that plea may entail, even if the consequence is automatic removal from the United States.

## XIV.    DEFENDANT'S ACKNOWLEDGEMENT

I have read and understand the provisions of this plea agreement consisting of **19** pages. I have discussed the case and my constitutional and other rights with my lawyer. I am satisfied with my lawyer's representation in this case. I understand that by pleading guilty, I will be waiving and giving up my right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial, to confront, cross-examine, or compel the attendance of witnesses, to present evidence on my behalf, to maintain my privilege against self-incrimination, and to the presumption of innocence. I agree to enter my plea as indicated above on the terms and conditions set forth herein.

> **NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY.**

I further state that I have not had any drugs, medication, or alcohol within the past 48 hours except as stated here:

_____

Defendant's Initials _____

**Exhibit B**

I understand that this plea agreement will take effect and will be binding as to the Parties **only** after all necessary signatures have been affixed hereto.

I have personally and voluntarily placed my initials on every page of this plea agreement and have signed the signature line below to indicate that I have read, understand, and approve all of the provisions of this plea agreement, both individually and as a total binding agreement.

11/3/22
DATE

JOHN HORNBUCKLE
Defendant

## XV.  COUNSEL'S ACKNOWLEDGMENT

I have discussed this case with my client in detail and have advised my client of all of my client's rights and all possible defenses. My client has conveyed to me that my client understands this plea agreement and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case and are in accord with my best judgment. I concur in the entry of the plea agreement on the terms and conditions set forth herein.

11/3/22
DATE

MAX PULLIAM
JOSHUA LOWTHER
Defendant's Counsel

Page 18 of 19          Defendant's Initials _____

**Exhibit B**

## XVI.       GOVERNMENT'S ACKNOWLEDGMENT

I have reviewed this matter and this plea agreement and concur that the plea

and disposition set forth herein are appropriate and are in the interests of justice.

PRIM F. ESCALONA
United States Attorney

11/3/22
_____          _____

DATE                     JOHN B. WARD
DON B. LONG
Assistant United States Attorneys

Defendant's Initials

**Exhibit B**

# EXHIBIT C

## Order of Restitution

FILED
2023 Mar-17 AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | **5:22-cr-78-LSC-NAD** |
| | ) | |
| **JOHN HORNBUCKLE** | ) | |

## <u>Order of Restitution</u>

The Court finds that the following entities are victims of the criminal conduct of John Hornbuckle underlying the conviction in this case, and that those entities have sustained loss in the following amounts:

| | |
|---|---|
| Medicare | $4,354,133.66 |
| Blue Cross Blue Shield of Alabama | $3,847,085.35 |
| Medicaid | $820,576.67 |
| TRICARE | $170,209.52 |
| **Total Loss** | **$9,192,005.20** |

The court hereby orders John Hornbuckle to pay restitution of $9,192,005.20 without interest, jointly and severally with Eric Beck. The restitution should be paid to the victims listed below in the amounts listed above:

**Medicare**
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mailstop C3-11-03
Baltimore, MD 21244
RE: *United States v. John Hornbuckle*, 5:22-cr-78-LSC-NAD

1

**Exhibit C**

**Blue Cross and Blue Shield of Alabama**
Attn: Network Integrity Department
Mail Stop# F01027
PO Box 12381
Birmingham AL 35202-2381
RE: *United States v. John Hornbuckle*, 5:22-cr-78-LSC-NAD

**Medicaid**
Beverly Churchwell, Director
Program Integrity Division
Alabama Medicaid Agency
501 Dexter Avenue
Montgomery, AL 36104
RE: *United States v. John Hornbuckle*, 5:22-cr-78-LSC-NAD

**TRICARE**
Defense Health Agency, Aurora
ATTN: Finance Office
16401 E Centretech Parkway
Aurora, CO 80011-9043
RE: *United States v. John Hornbuckle*, 5:22-cr-78-LSC-NAD

Because there are multiple payees, any payment not made directly to a payee shall be divided proportionately among the payees using the percentages below:

| | |
|---|---|
| Medicare | 47% |
| Blue Cross Blue Shield of Alabama | 42% |
| Medicaid | 9% |
| TRICARE | 2% |

Note: Each victim's recovery is limited to the amount of its loss, and the defendant's liability to a victim for restitution ceases if and when the victim receives full restitution.

Restitution shall be due and payable immediately. Any payment schedule represents a minimum payment obligation and does not preclude the United States

2

**Exhibit C**

Attorney's Office from pursuing any other means by which to satisfy the defendant's full and immediately enforceable financial obligation under applicable federal and/or state law. Payments shall be made to Clerk, U.S. District Court, for transfer to the payees.

   **DONE** and **ORDERED** on March 17, 2023.

_____
                    L. Scott Coogler
              United States District Judge

                                                          202713

3

**Exhibit C**

# EXHIBIT

# D

## Judgment

FILED

2023 Mar-17 AM 09:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of Alabama

UNITED STATES OF AMERICA

     v.                            Case Number 5:22-CR-078-LSC-NAD

JOHN HORNBUCKLE
    Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, JOHN HORNBUCKLE, was represented by Max Pulliam and Joshua Lowther.

On motion of the United States, the court has dismissed count 3.

The defendant pleaded guilty to counts 1 and 2. Accordingly, the defendant is adjudged guilty of the following counts, involving the indicated offenses:

| Title & Section | Nature of Offense | Count Number(s) |
|---|---|---|
| 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)) | CONSPIRACY TO PAY AND RECEIVE KICKBACKS | 1 |
| 18 U.S.C. § 1349 (18 U.S.C. § 1347) | HEALTHCARE FRAUD CONSPIRACY | 2 |

As pronounced on March 10, 2023, the defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the United States a special assessment of $200.00, for counts 1 and 2, which shall be due immediately.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.

Done this 17th day of March, 2023.

L. Scott Coogler
United States District Judge
202713

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 2 - Imprisonment

Judgment--Page 2 of 7

Defendant: JOHN HORNBUCKLE
Case Number: 5:22-CR-078-LSC-NAD

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SIXTY (60) months as to Count 1 plus EIGHTY (80) months as to Count 2, separately and to be served concurrently with each other.

The Court makes the following recommendations to the Bureau of Prisons: That the defendant be housed in a facility close to Huntsville, AL.

The defendant shall surrender to the United States marshal for this district by 12:00 PM on 5/9/2023.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at _____

_____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 - Supervised Release

Judgment--Page 3 of 7

Defendant:  JOHN HORNBUCKLE
Case Number:  5:22-CR-078-LSC-NAD

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 36 months as to Counts 1 and 2, to be served concurrently with each other.  The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

### STANDARD CONDITIONS OF SUPERVISED RELEASE

While the defendant is on supervised release pursuant to this Judgment:
1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced (if placed on probation) or released from custody (if supervised release is ordered), unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when to report to the probation officer, and you must report to the probation officer as instructed.
3) You must not commit another federal, state, or local crime.
4) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified, for the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers). Revocation of supervision is mandatory for possession of a firearm.
5) You must not unlawfully possess a controlled substance.
6) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. You must contribute to the cost of drug testing unless the probation officer determines you do not have the ability to do so. Based upon a court order entered during the period of supervision for good cause shown or resulting from a positive drug test or evidence of excessive use of alcohol, you shall be placed in the Substance Abuse Intervention Program (SAIP) (or comparable program in another district).
7) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
8) You must follow the instructions of the probation officer related to the conditions of supervision.
9) You must answer truthfully the questions asked by the probation officer.
10) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change. (If you have been convicted of a crime of violence or a drug trafficking offense, the probation office is responsible for complying with the notice provisions of 18 U.S.C. § 4042(b) and (c) if you change your residence.)
11) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
12) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as the position or the job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
13) You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
14) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
15) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
16) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk, and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
17) You must fully and truthfully disclose financial information as requested by the probation officer related to the conditions of supervision. Financial information may include, but is not limited to, authorization for release of credit information, bank records, income tax returns, documentation of income and expenses, and other financial information regarding personal or business assets, debts, obligations, and/or agreements in which the defendant has a business involvement or financial interest.
18) You must support all dependents.

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 - Continuation of Standard Conditions of Supervised Release

Judgment--Page 4 of 7

Defendant:  JOHN HORNBUCKLE
Case Number:  5:22-CR-078-LSC-NAD

### CONTINUATION OF STANDARD CONDITIONS OF SUPERVISED RELEASE

19)   You must comply with the probation office's Policies and Procedures Concerning Court-Ordered Financial Obligations to satisfy the balance of any monetary obligation resulting from the sentence imposed in the case.  Further, you must notify the probation officer of any change in your economic circumstances that might affect your ability to pay a fine, restitution, or assessment fee.  If you become more than 60 days delinquent in payments of financial obligations, you may be: (a) required to attend a financial education or employment preparation program under the administrative supervision of the probation officer; (b) placed on home detention subject to location monitoring for a maximum period of 90 days under the administrative supervision of the probation officer (and you must pay the cost of monitoring unless the probation officer determines you do not have the ability to do so); and/or (c) placed in a community corrections center for up to 180 days under the administrative supervision of the probation officer (and you must pay the cost of subsistence unless the probation officer determines you do not have the ability to do so).

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 3 (cont'd) - Supervised Release

Judgment--Page 5 of 7

Defendant:  JOHN HORNBUCKLE
Case Number:  5:22-CR-078-LSC-NAD

## SPECIAL CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)   You must cooperate in the collection of DNA under the administrative supervision of the probation officer.
2)   You must not use or possess alcohol.
3)   You must participate in the Substance Abuse Intervention Program (SAIP) (or comparable program in the district of supervision) under the administrative supervision of the probation officer, and you must comply with the requirements and rules of the program.  This program includes the following components: (a) testing by the probation officer or an approved vendor to detect prohibited drug or alcohol use; (b)  substance abuse education; (c) outpatient substance abuse treatment, which may include individual or group counseling, provided by the probation office or an approved vendor, and/or residential treatment; (d) placement in a community corrections center (halfway house) for up to 270 days; and/or (e) home confinement  subject to electronic monitoring for up to 180 days. You must contribute to the costs of participation unless the probation officer determines you do not have the ability to do so.
4)   You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.
5)   You must not incur any new debts (other than normal debts for existing utilities, rental expenses, or mortgage payments), increase existing credit lines, or open any new lines of credit without the permission approval of the probation officer unless and until all court-ordered financial obligations have been paid in full.  New debt includes contracts which obligate payments, credit agreements, and loans, including those with friends and family members.
6)   You must maintain a single checking and/or savings account in your own legal name.  You must deposit all personal income and monetary gains into the account(s) and must pay all personal expenses from this account.
7)   You must not obtain or maintain employment in the following occupation, business or profession:  No job that involves billing Federal Health Insurance Programs or work for business that bills Federal Healthcare Programs. The Court finds that: 1) a reasonably direct relationship exists between your business, occupation, or employment and the conduct constituting the offense; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, you will continue to engage in unlawful conduct similar to that of which you were convicted. This condition is imposed for the term of probation or supervised release.

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 5 - Fine

Judgment--Page 6 of 7

Defendant:  JOHN HORNBUCKLE
Case Number:  5:22-CR-078-LSC-NAD

## FINE

The defendant shall pay a fine of $250,000.00.

The Court has determined that the defendant does not have the ability to pay interest, and it is accordingly ordered that the interest requirement is waived.

This fine is due and payable immediately .

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed.  See 18 U.S.C. § 3614.

**Exhibit D**

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 6 - Restitution and Forfeiture

Judgment--Page 7 of 7

Defendant:  JOHN HORNBUCKLE
Case Number:  5:22-CR-078-LSC-NAD

## RESTITUTION AND FORFEITURE

### RESTITUTION

The Court orders restitution in the amount of **$9,192,005.20** as set out in the order entered contemporaneously in this case.

### FORFEITURE

The defendant is ordered to forfeit the following property to the United States:

**$176,449.19**

**Exhibit D**

# EXHIBIT

# E

**Amended Order of Forfeiture**

FILED

2023 Mar-16 AM 09:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Case No.: 5:22-cr-00078-LSC-NAD** |
| | ) |
| **JOHN HORNBUCKLE,** | ) |
| **Defendant.** | ) |

## *AMENDED* FINAL ORDER OF FORFEITURE

In the Notice of Forfeiture included in the Indictment in this case, the United States sought forfeiture of any property of Defendant JOHN HORNBUCKLE, pursuant to 18 U.S.C. § 982(a)(7)**,** constituting or derived from proceeds traceable to the conspiracy to commit health care fraud offense charged in Count Two in violation of 18 U.S.C. §§ 1347 and 1349. The Notice of Forfeiture also informed Defendant of the Government's intention to seek forfeiture of substitute assets in the event the directly forfeitable property was unavailable.

On November 3, 2022, Defendant JOHN HORNBUCKLE entered a formal plea of guilty to Counts One and Two. In the plea agreement, Defendant agreed that the Court could enter an order of forfeiture against him in the amount of **$176,449.19**.

Therefore the court ORDERS:

**Exhibit E**

1.    That JOHN HORNBUCKLE, shall FORFEIT to the United States of America the **$176,449.19** in proceeds Defendant obtained, controlled, and benefitted from as result of the offense pursuant to 18 U.S.C. § 982(a)(7):

2.    That the Attorney General or his designee is hereby authorized to seize said property forfeited herein.

3.    That this Order of Forfeiture shall be deemed final as to Defendant JOHN HORNBUCKLE, and shall be made part of his sentence and included in Defendant's Judgment in accordance with Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure.

4.    That this Court shall retain jurisdiction in the case for the purpose of enforcing this Order.

**Exhibit E**

5.      That the Clerk of the Court shall forward two certified copies of this Final Order of Forfeiture to the United States Attorney's Office, 1801 Fourth Avenue North, Birmingham, AL 35203, Attention: Austin Shutt, Assistant U.S. Attorney, and one certified copy to the U.S. Marshals Service.

**DONE** and **ORDERED** on March 16, 2023.

_____

L. Scott Coogler
United States District Judge

202713

3

**Exhibit E**

# EXHIBIT

# F

## Sentencing Memorandum

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | **5:22-cr-78-LSC-NAD** |
| | ) | |
| **JOHN HORNBUCKLE** | ) | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States submits this memorandum for the Court's consideration in determining an appropriate sentence for defendant John Hornbuckle. The presentence investigation report (PSR) correctly calculates the U.S. Sentencing Guidelines range as 70 to 87 months. The United States recommends that the Court sentence this defendant to 80 months in custody.

### ARGUMENT

**I.     The PSR Correctly Calculates The Defendant's Guidelines Range**

According to Hornbuckle's PSR, his Guidelines range is 70 to 87 months. Hornbuckle objects to that calculation because it includes a four-level leader/organizer enhancement. That objection lacks merit.

The Guidelines commentary identifies several factors that the Court should consider in determining whether this level of enhancement applies. Those factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a

1

**Exhibit F**

larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S. Sent'g Guidelines Manual § 3B1.1 cmt. n.4. Those factors support the application of the enhancement to Hornbuckle's conduct in this case.

Hornbuckle exercised significant decision-making authority and control in the QBR fraud and kickback scheme. With more than a decade of experience running health care companies, Hornbuckle moved back to Huntsville and co-founded QBR. For the whole conspiracy period, he served as president and CEO.

Hornbuckle recruited accomplices to his scheme. He needed a doctor to interpret test results in order for insurance companies to pay for the tests, so he recruited Eric Beck to serve as interpreting physician and bill for the tests (and then send the money to QBR). He needed sales reps to expand QBR's reach at pain management clinics in the region, so he gave Brian Bowman, James Ray, John Robson, and others a bucket of kickback money per patient to allocate between the sales rep and the doctor.

Hornbuckle played a central role in the scheme. The more the doctor was paid for each patient, the less the sales rep would get. It was Hornbuckle, not the sales reps, who authorized what the bucket of kickback money would be. It was Hornbuckle, not the sales reps, who decided how the payments would be

2

structured—disguised as hourly oversight fees rather than the per-patient kickbacks they truly were.

The government will be prepared to present evidence at sentencing to further flesh out Hornbuckle's role in the scheme.

## II.   A Guidelines-Range Sentence Is Fair And Reasonable For This Defendant

The government recommends a sentence of 80 months. That sentence, near the midpoint of the Guidelines range, would be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a).

This sentence would take account of the nature and circumstances of Hornbuckle's offenses. This case involved kickbacks and fraud that cost insurance companies many millions of dollars. The sentence would also take account of Hornbuckle's own personal characteristics. Hornbuckle knew better. He had led other health care companies in California. He was an experienced hand who knew the rules and willfully broke them for personal gain.

The proposed sentence would also justly punish the crimes, promote respect for the law, and afford adequate deterrence. These crimes need stiff penalties to afford adequate deterrence. As noted, Hornbuckle knew better yet continued to pay kickbacks and incentivize medically unnecessary (and uncomfortable and sometimes painful) nerve conduction tests to make more money.

Exhibit F

The sentence Hornbuckle receives should send the message that healthcare fraud and kickbacks will not be tolerated. These crimes do untold damage to our healthcare system and the taxpayers who fund it. *See, e.g.*, *United States v. Moss*, 34 F. 4th 1176, 1181 (11th Cir. 2022); *see also United States v. Howard*, 28 F. 4th 180, 186, 207, 209 (11th Cir. 2022) (reversing a healthcare fraud sentence as too low, and recognizing that "white collar medical crimes like [this one] are serious because they can disrupt health care markets"); *United States v. Carreras*, 793 F. App'x 859, 863-64 (11th Cir. 2019) (approvingly citing trial court's decision regarding "negative impact" of Medicare fraud on the nation's healthcare system). And yet there is a "tendency for people to consider crimes against the government as less serious than crimes committed against a person." *Carreras*, 793 F. App'x at 864.

Deterrence is therefore critical. "[O]ne of the primary objectives of the sentence is to send a message" to others who contemplate such schemes that their crime is a serious one "that carries with it a correspondingly serious punishment." *Howard*, 28 F. 4th at 209 (cleaned up); *see also, e.g.*, *Moss*, 34 F. 4th at 1181 (affirming 97-month sentence for a doctor responsible for millions of dollars in fraudulent billings); *United States v. Oudomsine*, 57 F.4th 1262, 1268 (11th Cir. 2023) (affirming 36-month sentence for defendant who had fraudulently obtained an $85,000 COVID-19 disaster relief loan and whose Guidelines range was 8 to 14 months).

4

**Exhibit F**

The Court should impose an 80-month sentence for Hornbuckle's fraud—one that put a million dollars of kickback money in Mark Murphy's pocket and a million dollars of kickbacks in Brian Bowman's pocket, too. A middle-of-the-range sentence would signal that the crimes are serious, that the laws against them deserve respect, and that recalcitrant violators will be punished.

## CONCLUSION

The PSR appropriately calculated the defendant's Guidelines range. The defendant should receive an 80-month Guidelines-range sentence.

Respectfully submitted,

PRIM ESCALONA
United States Attorney

*/s/ John B. Ward*
JOHN B. WARD
DON B. LONG
Assistant United States Attorneys

5

**Exhibit F**

**CERTIFICATE OF SERVICE**

I certify that, on March 8, 2023, I filed this document with the United States

District Court for the Northern District of Alabama, and caused a copy to be served

on the defendant's counsel of record.

/s/ John B. Ward

JOHN B. WARD
Assistant United States Attorney
1801 Fourth Avenue North
Birmingham, AL 35203
(205) 244-2001

**Exhibit F**